Good morning and may it please the court. My name is Hillary Walsh and I represent petitioner Ibolito Dijar Duran. I would like to reserve five minutes for rebuttal. All right. This case, thank you your honor, this case is about a Mexican cartel's persecution and torture of Mr. Dijar, a Mexican man who came to the United States to seek asylum. He's been detained in Illoy, Arizona for two years. He was persecuted because he is the cousin of a In the IJ's opinion, the IJ concludes that there is no evidence in this record that one of the reasons why the cartel harmed or is seeking to harm the respondent is because he is Manuel's cousin. Is that conclusion supported by substantial evidence? No, your honor. The record compels the court find that at a minimum there's a reason and it is our position today that it compels, the record compels that it is a central reason. I'd like to take the court to administrative record page 151. Specifically, this is the evening of the eighth day of captivity where Mr. Dijar and the other captives are in the mango orchard and they're all lined up execution style on their knees, topless with their handcuffs behind their back, hoods over their eyes and the cartel arrives. And the first and only words out of his mouth are, who's Manuel's cousin? Mr. Dijar is identified and the cartel leader approaches him and says, because you're Manuel's cousin, I'm not going to kill you today, but I need you to make me a promise. You're going to help find him and I give you two months. Are you in or are you out? Understandably, Mr. Dijar agrees and then the cartel leader says to him, I'm going to show you now what happens if you break your promise. And this is then when the horrific events transpire regarding the dismembering of this other man from Topeak. The record is replete with other instances of who's Manuel's cousin. So even if we just take this one isolated event, there is evidence in this record where the IJ said there's no evidence. There is evidence in this record, highly indicating, I mean, proving that a reason Mr. Dijar was targeted was because he's Manuel's cousin. Essential reason, indeed. This harkens back to Bringas Rivas, which I know Judge Wardlaw, you're intimately familiar with, as you wrote the en banc decision, where the government argued on appeal that Mr. Bringas had not been targeted as a child and horrible things happened to him as a child because of his homosexuality, but it was instead because of the perverse interests of those who were molesting him and raping him as a child. This court found otherwise. This court found that instead, a central reason, but for Mr. Bringas' homosexuality, he would not have been targeted. The same is true here, but for Mr. Dijar, being Manuel's cousin, repeatedly throughout the record, it shows that he was beaten more than the other people who were held captive with him. He was, they came to him and they said, we're coming at you, we're doing this to you because you're Manuel's cousin. There's no other reason that's given. Importantly, the IJ didn't enter an adverse credibility finding here, and so Mr. Dijar's testimony must be taken as credible and all reasonable inferences drawn from it. So the record does indeed compel a different outcome. Go ahead. Does it matter at all that Rinaldo, who is not related to Manuel, that he was also picked up and beaten and sent out to find out where Manuel was? Thank you for asking that, Judge, because it's so important that that is clarified here today. The record never says, no one ever says anywhere in this whole record that Rinaldo was picked up, was targeted, was persecuted, was tortured because he knew Manuel. The only information that the record speaks to is that Rinaldo and Mr. Dijar were released at the same time, that they both know Manuel, and that contrary to the leader telling Mr. Dijar, I need you to promise to do this to me, otherwise look what's going to happen to you. The record shows that they told Rinaldo, keep an ear out. If you know anything, give us a call. Totally different circumstance. If we look at why they were targeted. I mean, that's a decent argument for reading the record the other way. But why isn't it enough for the agency to say that where the testimony is that the cartel leaders said when Rinaldo was released at the same time, that if he heard anything to call about Manuel, why doesn't that support an inference that that given the release at the same time, the similar instruction, that that was the reason why Rinaldo was held and that that supports an inference that it was not due to the cousin relationship as opposed to the knowledge of Manuel. Because the inference of why he was targeted does not exist. Record evidence does not exist as to why Rinaldo was targeted, why he was released. Sure, because we want you to help find Manuel. My point is, does it support a circumstantial inference that when they released at the same time with similar instructions that they were detained for the same reason? It does not, your honor. We have no record evidence shows why he was detained to begin with. The government and the agency have repeatedly written this into the record, and it does not exist. We know why they were released at the same time. They both apparently knew Manuel, but the record is replete with instances for why Mr. Dihar was targeted. It's important to note here also that the immigration judge and government council all agreed that Mr. Dihar was persecuted in the past. This is significant. This man faced past persecution, and the reason for it, the record goes over and over and over why it occurred. And to say that there's no evidence, to come to the conclusion that there's no evidence, and instead we've Rinaldo's release into this discounts all of Mr. Ippolito's credible testimony and all the inferences that are to be followed with his testimony. Indeed, even Dr. Shirk's was targeted was because he has a familial relationship with Manuel. This is evidence, Judge. Is it significant at all that no other members of the family were targeted? Under Ninth Circuit precedent, no, your honor, because those individuals are not similarly situated. It's interesting that the immigration judge relied on the fact that Mr. and okay in Nairi. It's his ex-partner and his little girl and his stepson. These individuals have they have no presumed knowledge of Manuel's location. So the fact that those family members weren't targeted in order to get to Manuel's location is really irrelevant. The same is true for the mother. The mother lives in Kalima, which we know that Manuel eventually fled there because we have inside information. But that doesn't mean that the cartel is going to know that he's now with the mother. So weeding all these other things in in order to find no evidence that a reason, any reason that Mr. Dihar was targeted was because of this familial relationship. It simply cannot stand the record compels otherwise. Additionally, turning to cat while I have a just a moment, if I may, your honors. Regarding acquiescence, the immigration judge ignored dispositive testimony regarding past government acquiescence, future probability of torture and internal relocation. I want to talk to you for just a moment. Highlight to the court who Dr. Shirk is because the immigration judge discounted his testimony is speculative. Dr. Shirk has testified three times to our Senate and House. He has a $5 million contract with the Department of Homeland Security, the Department of Justice. He's advised the CIA, the Department of Justice and the CIA. Our entire government relies on this individual for his expert opinion. And the immigration judge in this case discounted all of his testimony is speculative. What is speculative? Speculative is when we have no basis and we're guessing about what's going to happen. Dr. Shirk provided numerous examples of why he came to the conclusion that Mr. Dehar faces an almost certain likelihood of future torture and over 80 percent likelihood that the government would turn a blind eye to that. And in her decision, she does not address these things. Instead, she finds that Dr. Shirk's testimony alone does not establish acquiescence. And then later concludes that because the Marines were in the area, it shows that perhaps they were able to assist Mr. Dehar. Interestingly, the immigration judge does not include and incorporate numerous areas of the record. Specifically, if I could turn the court's attention to the congressional research report that corroborates Dr. Shirk's testimony that even if the military had shown up and tried to help Mr. Dehar, they would not have helped him. This is our own Congress's report that the immigration judge's decision does not include and under Cole versus Holder, under the CAT regulation, anytime we have highly persuasive, dispositive evidence that the immigration court doesn't include or consider, we have to vacate. These are very strong arguments if we were reviewing De Novo, but we're not. And the IJ explained, particularly on the military, the whole taking them into the grove when the military was in the area. His explanation that, well, maybe the military was with another gang, that was one of the things she identified as speculative. Why isn't that supported by substantial evidence? Why wasn't that a permissible conclusion to draw about his testimony on that point? Because the record says otherwise, Your Honor. Dr. Shirk's testimony, I mean, not only is he a country conditions expert, it's not speculative when he's basing it on extensive research. So the report that's in the record that's from our Congress, special reports. I have it in my notes. Let me find them. What I'll do if it's okay with the court is I want to preserve the rest of my time for rebuttal, and I want to answer your question if that's okay, Judge, once I get my notes sorted, okay? Thank you, Your Honor. All right. Thank you, counsel. Good morning, Your Honors. May it please the court? My name is Julie Iverson, and I represent the United States. There's no doubt that the harm that Mr. Dihar described in his declaration to the agency was severe. That can't be minimized, and it's not in dispute by the agency. However, Congress, through the INA, has not seen fit to provide someone in Mr. Dihar's situation with on account of a protected ground or protection under the Convention Against Torture, consent or acquiescence by public officials. The agency found Mr. Dihar did not demonstrate he was persecuted on account of a protected ground or that public officials will acquiesce to his torture. Can you address the point about Rinaldo that the record is really fairly thin? It comes down to these few lines on Administrative Record 156. What does it say about Rinaldo? What Mr. Dihar testified to about Rinaldo was that he was another person held in captivity at the same time, and that they were released at the same time. And when Rinaldo was released, the cartel asked or told him to provide information about the whereabouts of Manuel. Mr. Dihar also testified that Rinaldo was not related to him, and also Rinaldo was not related to Manuel. So the testimony was basically that another individual who was not related to either of them was asked to provide information on Manuel's whereabouts. Is there anything in the record about why Rinaldo was captured in the first place? Or what they said to him during his captivity, nothing? No, Your Honor. The only evidence in the record regarding Rinaldo is Mr. Dihar's own testimony that he was unrelated and that the cartel also asked Rinaldo for information about Manuel's whereabouts. And the agency relied on that in addition to the fact that none of the other family members of Manuel or Mr. Dihar seemed to be targeted by the cartel. And they use that as objective evidence that there was another reason besides the family membership for the cartel's interest in Mr. Dihar. And Mr. Dihar notably lived in the same residence as Manuel. They were roommates, and his cousin Manuel was a drug dealer. So the inference that the agency made based on these objective facts, including that the cartel also asked Rinaldo about Manuel's whereabouts, and also that no other family members were targeted, the inference that the agency made was that the reason the cartel was going was had interest in Mr. Dihar was not because of his family membership and his relationship to Manuel, but because he, perhaps because of his proximity to Manuel, might have information about where Manuel was located. Would family membership have to be the exclusive reason for them to have picked up Manuel and Mr. Dihar and treated him as they did and then sent them out to find Manuel? With respect to asylum, the protected ground would have to be one central reason, at least one central reason. This court has found with respect to withholding of removal, a protected ground would have to be a reason for any past harm or feared harm. And while there is evidence that the cartel knew that they were related and called him his cousin on numerous occasions, their reference to him as his cousin is only evidence that they knew he was his cousin. It's not evidence that they sought to harm him, to persecute him because he was his single amount for extra beatings. And when the boss came on that really major awful night, he asked for, the boss asked for Manuel. He didn't ask for anybody else. And because he was, I'm sorry, he asked for Dihar because he was Manuel's cousin. And in fact, the threat that was given to him versus the request to Rinaldo was a significant magnitude difference here. I mean, Dihar was told his family was going to be killed if he didn't help trap his cousin. The, so Mr. Dihar's proximity, the inference that the agency made and which substantial evidence supports, and the record does not compel a contrary conclusion, is that he's also roommates and lives with the person and in addition to being his cousin. Do you understand, I mean, I, you know, it constantly amazes me like how in the Mexican culture, familial relationships are like a premium paramount. I know there's not evidence in the record of this, but that relationship is of a special class in that As Ms. Walsh stated in her, in her, during her time, when she was asked about why they weren't targeting other family members, she said they weren't similarly situated because they had no presumed knowledge of Manuel's location. So the thing that the cartel is interested in, or at least that the inference that the agency made, which was reasonable, and a reasonable fact finder could make that inference, is that they were after his whereabouts and that the family membership is, their use of the word cousin and calling him cousin is just, is just evidence that he, they had awareness he was the cousin and not that they were targeting him because of that, as opposed to the fact that he was in proximity to that person and might have knowledge about his whereabouts. But it's not just proximity, trust is another big part of that familial relationship and that he might be entrusted with knowledge about Manuel because of that relationship. That might be one inference that is made. And while another fact finder could have made that inference and could have made that conclusion, and it could have been, supported by substantial evidence, this fact finder made a different inference and, and the record does not compel a contrary conclusion. So it really comes down to the standard of review here, which is very deferential with respect to your question. How about, am I right that they said if you don't find, if you don't help us find Manuel, we're going to injure your family? Uh, that's what Mr. Dihar testified to. Well, don't we have to accept that as being true? Uh, but I don't believe that that indicates that they were going after Manuel because he was Dihar, or I'm sorry, that they were going after Dihar because he was, um, related to Manuel. But if they didn't say something similar, at least we don't know whether they did to Ronaldo, wouldn't that suggest that family membership was important here? I'm not sure. I'm not sure, your honor. I, I, I don't know why they didn't say, I don't know what the circumstances, I don't, for example, there, Ronaldo didn't live with Manuel. So that's something that's distinguishable. So you wouldn't think that would be, that would be a distinction with respect to threatening the family. Um, I'm not sure, your honor. I'm, I'm not sure why the severity of the threat was different with, with, between, uh, Mr. Dihar and Ronaldo. I do know with respect to the, the question about why he seemed to be, or why Mr. Dihar's interpretation was that he was singled out for worse treatment, um, by the cartel. I like to note that the man from Topeak probably had the worst treatment of that incident. Um, and then the other captives also had, were, who were not related. We don't know anything about why other people were detained or what basis was going on with them. Let me ask you about, um, the, the, um, IJ seemed to pretty dismiss the expert testimony out of hand. What do we make of that? Your honor, I don't, I find other things more credible than, I just don't find this expert credible. And, um, that struck me as odd. It was very dismissive. Your honor, I don't think he didn't find him credible. I think what the IJ noted is that his only specific knowledge, or his only knowledge specific to Mr. Dihar's case was based on his, um, interview with Mr. Dihar. And while he had lots of knowledge about the background conditions of the country in general, he, with respect to Mr. Dihar's case, he only, it was only based on his, um, having spoken to him is, is what I believe. Um, I don't believe it was dismissive of his expertise at all. I believe it was just focusing on the fact that his, his expertise was more of a general nature, whereas Mr. Dihar, and it was, and he did have specific knowledge with respect to what had happened to Mr. Dihar. So why would it, so in ordinary cases, um, civil, criminal, other cases, expert, um, experts are permitted to testify about, based on their knowledge and experience, how a particular situation would be treated. And their testimony isn't discounted, um, because they, you know, they're using their expertise to bring to bear to their analysis of the situation. I believe here, your honor, it was his, his expertise and his testimony was considered, but it was also considered, uh, in conjunction with the other objective evidence. So here, the other objective evidence is the Navy. Um, whenever the Navy was in the area, the cartel would gather up all the captives and go into hiding. Mr. Dihar testified that the cartel was scared of the Navy. Um, there's also evident, uh, record evidence, different articles that petitioners submitted that talks about how the Navy is really sort of, in Mexico, sort of the, the government entity going after the cartels or responsible for initiating operations against the cartels. Um, Mr. Dihar's testimony is at page 178 to 179. Um, and then the articles are at page 338, 357, 407, which talks about the importance of the Navy in, in, in going after cartels. So the, the board also was looking at that evidence that every time the Navy was in the area, the cartel seemed to be scared and they used that objective evidence, um, to, to find that Mr. Dihar had not met his burden to demonstrate, demonstrate the requisite acquiescence. Um, as for the number that Mr., Dr. Shirk used of there's an 80% chance, uh, that this would happen to him, that's not really a quantifiable number. It's sort of a made up guess or, and the board's task is not just to listen to what an opinion says, but to view all of the, uh, uh, objective evidence. Um, and here they made a, they made the inference, um, based on the Navy, every time the Navy coming to, uh, in the area that they would go in hiding, that there wasn't the acquiescence. Mr. Dihar didn't testify or claim that there was any sort of corrupt official that he had been, had any interaction with. Um, there's, there's really an absence of, of any sort of state or local official not, or having some, some sort of involvement with the, um, the cartel. So here, again, it goes back to the standard of review. While another fact finder may find that substantial evidence supported, uh, well, another fact finder could have found in Mr. Dihar's favor that conclusion is not compelled here. Are there any other questions, your honors? Okay. Thank you, your honors. Um, for the reasons stated today and for, uh, the reasons in the, in our brief, uh, we asked that the court denied the petition for review, uh, because it, the agency's decision is supported by substantial evidence. Thank you, counsel. Thank you very much. Thank you, your honor. So, um, Judge Collins to your question and kind of to why, why did the, it was the immigration judge, um, clearly erroneous when she basically discounted Dr. Shirk's, um, testimony. The record. So a couple of things, the record shows that Mr. Shirk, Dr. Shirk didn't just review Ippolito's declaration and said the declaration and the testimony again shows that Dr. Shirk states he reviewed, I mean, there's 17 paragraphs of everything that he'd reviewed leading up to the point starting in 1996 and leading to, I think, you know, April 29th, 2019, when the declaration was submitted. And then even between April 19th and May 8th, when the, when the individual was Dr. Shirk stated that he reviewed relevant country conditions, evidence, including the 2018 state department records documents that the immigration judge said contradicted Dr. Shirk's findings. So that part of the evidence, that part of the, the argument that he simply only reviewed one thing, which was Ippolito's declaration is simply incorrect as the record. On the rejection of his testimony about the alternative explanation for their fear of the record, the constant going into the grove and having them lie down and be covered. And he said that that might be due to the Navy working for a rival organization. And IJ pressed him on that point specifically. And he did say, I'm speculating to the extent that I don't have, I don't have intelligence or specific information about the specific military garrison in question. He then explained why he would draw an inference from the country conditions that that was true. But given that he admitted, he didn't know that why couldn't IJ just say, I don't draw that inference. Isn't that permissible under substantial evidence? No, your honor, because he said, I don't know the particular military garrison that was following them around, but your honor, if you go down about five, six lines on that page of the transcript, it specifically says I'm speculating because I don't know the exact military garrison, but I'm not speculating about this. I have personally seen cases, he says, where they have gone in. He's not speculating about the country conditions as a whole and that, you know, different rival criminal organizations may rely on the Mexican government, but he's drawing an inference from the general knowledge to the specific situation. And that was what the IJ refused to go along with. And why do we have to compel the contrary inference here? Yes, your honor, for two reasons. First, because he provided specific examples of firsthand knowledge. So when we talk about speculation, that's when it's based on nothing here. He has an objective, a conclusion that he's reached based on his experience. And also because the country conditions reports support him. This is really on pages 243 of the record through 247. And I'll hit the highlight reel. The National Defense, Federal Police, and the National Security Branch, CEMAR, were implicated in nearly 30 cases of sexual torture just in one year. That's page 147. National Defense CEMAR soldiers have been implicated in kidnapping for ransom, page 243. So, I mean, I can go on. 30 Navy members are suspected of being involved in disappearances, AR 244. So when the immigration judge cherry picks pieces of the country conditions evidence and says, I declined to follow what the country conditions expert says because I believe you're speculating, but the country conditions reports support the conclusion he's providing, we have clear error. I'm out of time. All right. Thank you very much, counsel. D. Harv versus Harv is submitted.
judges: Wardlaw, Eaton, Collins